## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| RACHELLE ELDREDGE,<br><br>         **Plaintiff,**<br>**vs.**<br><br>**STATE FARM MUTUAL**<br>**AUTOMOBILE INSURANCE**<br>**COMPANY,**<br>         **Defendant.** | **MEMORANDUM DECISION**<br>**AND ORDER**<br><br>**Case No.  2:12CV900 DAK** |

This matter is before the court on Defendant State Farm Mutual Automobile Insurance Company's ("State Farm") Motion for Partial Summary Judgment.  A hearing on the motion was held on January 22, 2014.  At the hearing, Plaintiff Rachelle Eldredge ("Ms. Eldredege") was represented by Joseph H. Jardine.  State Farm was represented by Paul M. Belnap and Nicholas E. Dudoich.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

This case centers around State Farm's denial of uninsured motorist ("UM") benefit coverage for an accident in which Ms. Eldredge suffered severe injuries on June 7, 2011, while she was vacationing in Kaneohe, Hawaii.  Ms. Eldredge has sued State Farm for breach of contract, breach of the covenant of good faith and fair dealing (the "bad faith" claim) and

intentional infliction of emotional distress. She claims that her damages are in large part due to the fact that State Farm failed to timely pay this claim, depriving her of treatment that would have mitigated the vast injuries she suffered in the subject accident.

In the instant motion, State Farm seeks dismissal Ms. Eldredge's bad faith claim, along with her claim for intentional infliction of emotional distress. State Farm argues that Ms. Eldredge's UM claim was "fairly debatable," and, under Utah law, Ms. Eldredge cannot prevail on a bad faith cause of action when the underlying insurance claim was fairly debatable. Ms. Eldredge, on the other hand, contends that this court cannot dismiss her claims because there are genuine issues of material fact concerning whether the investigation in this matter was "diligent," whether the claim was "fairly evaluated," whether State Farm acted promptly and reasonably in rejecting the claim, and whether the claim was "fairly debatable."

## UNDISPUTED FACTS

While Ms. Eldredge was vacationing in Hawaii in June 2011, with her husband and two sons, they rented mopeds to go sightseeing. Ms. Eldredge was trailing behind the rest of her family as they rode down the Kamehameha Highway. At some point, Ms. Eldredge's oldest son noticed that his mother was no longer right behind them, and he turned around to find her. He discovered her on the side of the road next to a utility pole. She was unconscious and had sustained significant injuries. Ms. Eldredge has no memory of the accident or how it occurred, and there were no witnesses to the accident.

The Honolulu Police Department ("HPD") arrived at the scene and investigated the accident.[1] The police report notes that the accident occurred at approximately 2:26 p.m. The

---

[1] Apparently the driver of a City and County bus had come upon the accident scene shortly after it happened, and the bus driver stopped to inform a police officer in the area about

roadway where the accident occurred was dry and level.  The HPD observed only minor damage

to Ms. Eldredge's moped, including scratches to the left side and a broken left mirror.  The police

report reflects that Ms. Eldredge's husband, Stephen Eldredge, told the officers on several

occasions that he believed another vehicle forced his wife off the road or struck her.[2]

 After investigating the scene, HPD concluded that no other vehicle was involved; rather,

the investigating officer concluded that Ms. Eldredge had lost control of her moped on the right

shoulder as she was traveling around a bend in the road.  According to the report, her moped slid

on its left side, Ms. Eldredge was ejected from it, and she possibly collided with a utility pole off

the right side of the roadway.  HPD worked with the HPD Crime Stoppers and the media to try to

locate a witness to the accident, but no one came forward.   HPD determined that there was "no

evidence that suggests that a second vehicle was involved" and that "Rachelle Eldredge, Operator

One, was responsible for this single unit collision."

 On or around February 6, 2012, Ms. Eldredge, through her attorney, made a demand for

UM coverage from State Farm.   The demand letter included some of Ms. Eldredge's medical

records from the University of Utah[3] and also included records from Queens Medical Center in

---

the accident.  The police officer notified dispatch via portable radio.

 [2]  The Police Report notes that "Stephen Eldredge did not see exactly what happened to his wife but thinks that another vehicle forced her off of the road or possibly struck her."  *See* Docket No. 10-2 at page 6 of 37.   In addition, elsewhere in the report, the HPD states that "[d]uring our conversations throughout the week, Mr. Eldredge related that he feels his wife was either hit by a vehicle or forced off the road . . . ."  *Id.* at page 19 of 37.

 [3]  Ms. Eldredge claims that these medical records contained the names of four doctors who signed off on an assessment that Ms. Eldredge was involved in a "moped versus automobile accident."  State Farm points out, however, that one of the doctors merely noted in the "Assessment" section of the records that "[i]t is believed she suffered a moped versus auto

Honolulu, Hawaii.  On February 22, 2012, Defendant State Farm sent an acknowledgment letter

that stated as follows:

> We are in receipt of your demand dated February 6, 2012.  State Farm received
> the documents on February 16, 2012.  Because of the large size of the document
> (4,928 + pages) it wasn't available for review by the claims department until
> February 20, 2012.
>
> We are reviewing the submitted information and will respond soon.

State Farm evaluated and investigated the claim and found insufficient evidence of a

second vehicle.  On February 27, 2012, State Farm denied coverage, responding as follows:

> Based on our review of the file the evidence does not support a motor vehicle was
> involved in this loss.
>
> Without contact or an independent witness to support clear and convincing evidence to
> the contrary, it appears a motor vehicle was not involved in this accident. Therefore,
> unfortunately Uninsured Motorist Coverage will not extend to the policyholder for this
> loss.
>
> We will remain open to any additional information which may be presented.

In April 2012, Ms. Eldredge submitted letters from two of her treating physicians to State

Farm in support of her claim.[4]  The first letter was from Elie Elovic, M.D., dated March 14,

---

accident . . . " and that phrase was repeated verbatim on the various doctors' records.  State Farm
notes that none of the four doctors actually state that the injuries caused them to believe that there
was a moped-automobile accident.  The court agrees with State Farm that this evidence does not
support the implied inference that four doctors believed that Ms. Eldredge was in a moped-
automobile accident based on her injuries.  In any event, the court finds this fact to be immaterial.

[4]  Ms. Eldredge disputes the dates on which the doctors' letters were sent to State Farm,
claiming that Dr. Elovic's letter was dated March 14, 2012 and that it was sent to State Farm at
about that time.  Ms. Eldredge does not provide any evidence that the letter was actually sent on
or near the date it was authored.  Moreover, the cover letter to State Farm from Ms. Eldredge's
counsel, referring to an enclosed letter from Dr. Elovic, is dated April 6, 2012.  In any event, the
court finds that whether the letter was sent in mid-March or early April is immaterial to the
resolution of this matter.

2012. In that letter, Dr. Elovic stated:

> After reviewing [Ms. Eldrege's] medical records including pictures from the accident scene, I can state with reasonable medical certainty that the injuries she sustained were not as a result of a simple flying over the handlebar but instead are a result of a rear impact on the moped which then caused Ms. Eldredge to fly over the handlebars.

The second letter, from David H. Workman, M.D., is dated April 18, 2012. In that letter,

Dr. Workman stated:

> After my review of all aspects of [Ms. Eldredge's] injuries, the hospital records, and the police reports, including their pictures of the moped she was riding, there is only one conclusion that can be reached. There is no possible way for [Ms. Eldredge] to have received the femur fractures she sustained without being hit in her back at a speed significantly faster than she was traveling, throwing her over the front of the moped and striking the handlebars with her thighs. The only other potential mechanism for her injuries would be hitting an object with the front of the moped at a fair rate of speed. The fact that there was no damage to the front of the scooter eliminates the second scenario as a possibility.
>
> The hematomas and other injuries to [Ms. Eldredge's] back and buttocks also support the fact that she was hit in the back while riding on the scooter. No other mechanism is feasible for the injuries that [she] suffered which would leave the scooter free of any front end damage.

On April 24, 2012, upon receiving the new information regarding Ms. Eldredge's claim,

State Farm informed Ms. Eldredge's counsel that it would be retaining a biomechanical/accident

reconstruction expert to review the submitted evidence and provide an opinion.[5] State Farm then

retained the services of Matthew Mecham of MRA Forensic Sciences in Salt Lake City for

---

[5] Ms. Eldredge does not dispute this assertion, but in her "Separate Statement of Additional Facts," she contends that State Farm "did no further investigation after it received the letters from Drs. Elovic and Workman until June of 2012." *See* Pl.'s Separate Statement of Additional Facts Not in Dispute ¶¶ 11-17 (pp. 17-18 of Pl.'s Mem. in Opp'n). It is unclear why she makes such a statement when it is undisputed that State Farm notified Ms. Eldredge's counsel on the same day it received the letter from Dr. Workman that it would be retaining a biomechanical /accident reconstruction expert to review the newly submitted evidence.

reconstruction and biomechanical analysis.

On June 11, 2012, Mr. Mecham sent his preliminary findings to State Farm. In arriving at his conclusions, Mr. Mecham reviewed the HPD report, photographs of the accident scene and of various mopeds, Ms. Eldredge's medical records, correspondence between counsel for Ms. Eldredge and State Farm, and the letters from the two doctors who examined Ms. Eldredge.

Mr. Mecham concluded that the available evidence refuted the theory that Ms. Eldredge's moped was struck from behind, as Dr. Elovic opined, or that Ms. Eldredge herself was struck, as Dr. Workman claimed. Mr. Mecham was skeptical about both doctors' conclusions because there was no indication that they had any experience in reconstructing motor vehicle accidents, an understanding of the laws of physics, or a background in impact biomechanics. Important factors in Mr. Mecham's analysis included, but were not limited to, the following: there were no witnesses that saw the accident; there was no damage to the rear of the moped that would have been consistent with an impact from behind; and the location and pattern of Ms. Eldredge's injuries were not consistent with a high-impact collision from the rear. Mr. Mecham concluded that there was "insufficient evidence to conclude that Ms. Eldredge was struck by a motor vehicle. In fact, the physical evidence was inconsistent with a motor vehicle striking Ms. Eldredge or the rear of Ms. Eldredge's moped." On June 14, 2012, State Farm sent a copy of Mr. Mecham's report to Ms. Eldredge.[6]

_____

[6] At some point after Mr. Mecham provided his preliminary report, but before State Farm received a report from Ms. Eldredge's expert, David Ingebretsen, State Farm obtained additional information and forwarded it to Mr. Mecham. The new information included a transcript of a recorded telephone interview with Mr. Ingebretsen, photographs taken by a Honolulu claim representative of the accident area and exemplar buses, 3 CDs of digital photographs, a map of the accident area, a bus schedule and the deposition transcript of the bus driver witness,

Ms. Eldredge retained biomechanical engineer David Ingebretsen of Collision Forensics and Engineering in Salt Lake City to analyze and investigate the accident. On July 13, 2012, Mr. Ingebretsen prepared a report summarizing his findings. The stated purpose of his report was "to determine the most likely forces which were applied to Ms. Eldredge and determine how they were applied." Mr. Ingebretsen opined that the "only physically possible scenario which can be reconciled with the physical evidence" is that "[a] passing vehicle with some object extending out the right side struck Ms. Eldredge on the right buttocks causing her to acquire the speed of the vehicle and causing the pelvis fractures." Mr. Ingebretsen concluded that Ms. Eldredge's crash "was not an accident in which Ms. Eldredge simply lost control of her scooter. There had to be another vehicle passing her which struck her from behind."

Ms. Eldredge's counsel then sent the Ingebretsen report to counsel for State Farm, who in turn forwarded it to Mr. Mecham for follow-up analysis. On August 15, 2012, after reviewing the Ingebretsen report, as well as Queen's Medical Center records and films, Ms. Eldredge's appearance on the Today Show, and an investigative report authored by a Honolulu attorney hired by the Eldredge family, Mr. Mecham provided a supplemental report. In the report, Mr. Mecham stated the following:

> After reviewing and evaluating this additional information, I reaffirm the opinions expressed in my previous 6/11/12 and 7/2/12 reports. As previously indicated, these opinions and conclusions were founded upon a reasonable degree of scientific probability and are based upon my training, experience, education and the information provided for review.

Darrell-Lynn P. Silva. In a letter dated July 2, 2012, Mr. Mecham concluded that "after reviewing and evaluating the new information, I have determined that the opinions that were expressed in my June 11, 2012 report remain as stated." This update was sent to Ms. Eldredge's counsel three days later.

On August 23, 2012, State Farm sent a letter to Ms. Eldredge's counsel informing her that after review of the additional documents, "State Farm [did] not believe benefits are owed to Mrs. Eldredge under the facts and circumstances as we understand them and under the policy provisions previously referenced." The same day, Ms. Eldredge filed suit against State Farm for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress.

Shortly after the accident, Ms. Eldredge's husband retained the Honolulu law firm of Davis Levin Livingston ("DLL") to investigate the accident. Mike Livingston, one of the partners at DLL, compiled a status report summarizing the six-month investigation. The report details the findings of several investigators who DLL hired to look into the accident. Those individuals visited the scene of the accident, took photographs and videos of the area, interviewed HPD, interviewed the moped rental company, contacted Oahu Transit Services, deposed the bus driver who reported the accident, subpoenaed records from HPD/EMS/Honolulu Fire Department, and tracked down and interviewed a 911 caller.

As part of the investigation, DLL evaluated potential legal claims, including UM coverage under the Eldredge's State Farm auto policy. DLL tracked down and interviewed an individual who called 911 and reported the accident, Rosie Christ. Ms. Christ informed DLL that on the day of the accident she was driving immediately behind Ms. Eldredge and her family along the Kamehameha Highway. Ms. Christ noticed that Ms. Eldredge was trailing behind the other two mopeds. Ms. Christ then lost sight of Ms. Eldredge as she went around a bend in the road. When Ms. Christ rounded the bend, she could not see Ms. Eldredge. As Ms. Christ continued along the road, she saw a moped on the side of the road and realized that Ms. Eldredge had

crashed. Ms. Christ pulled over and called 911 and then walked over to Ms. Eldredge until her family arrived. Police and an ambulance arrived, but no one interviewed Ms. Christ or asked any questions, so she left the scene.

While Ms. Christ did not see Ms. Eldredge leave the road, crash, or fall, Ms. Christ stated that she was confident that no other car or cars were involved in the accident. Ms. Christ recalled that there were very few cars on that particular stretch of the highway that day. As the DLL investigator noted in his first interview with Ms. Christ, she reported that "[t]here were no vehicles next to [Ms. Eldredge] just prior to the crash and nothing ran into her to make her go off the road."

DLL also deposed the bus driver, Darrell-Lynn P. Silva, who reported Ms. Eldredge's accident to nearby a police officer. She testified that she did not witness the crash and only saw individuals and vehicles stopped along the highway as she passed the accident after it occurred. Ms. Silva also testified that the bus she was driving was not involved in this accident and that she did not hit or strike Ms. Eldredge or the scooter she was driving. If she had struck Ms. Eldredge, she stated that she would have followed protocol to report it their central office. After six months of investigating Ms. Eldredge's accident, coverage issues, and more, DLL came to the following conclusion:

> Based on our investigation, we do not believe that there is a claim to the underlying accident:
>
> We have not found any reliable evidence that [Ms. Eldredge's] accident was caused by a third party vehicle. To the contrary, the available evidence supports HPD's conclusion that this was a single vehicle accident.

The report also contains DLL's opinion regarding Ms. Eldredge's likelihood of

successfully making a UM claim. DLL determined that since they were unable to find any credible evidence that an uninsured motor vehicle existed, UM coverage triggers could not be met.

At the time of the accident, Ms. Eldredge was the named insured on State Farm automobile Policy No. 073 1057-E18-44A. The UM portion of her policy provides the following:

> 2. If there is no physical contact between that unidentified motor vehicle and the insured or the vehicle the insured is occupying, then the insured must show the existence of the other motor vehicle by clear and convincing evidence, which shall consist of more than the insured's testimony.

The Utah UM Statute, like Ms. Eldredge's State Farm policy, requires that the existence of a phantom vehicle be shown by clear and convincing evidence:

> When a covered person alleges that an uninsured motor vehicle under Subsection (2)(b) proximately caused an accident without touching the covered person or the motor vehicle occupied by the covered person, the covered person shall show the existence of the uninsured motor vehicle by clear and convincing evidence consisting of more than the covered person's testimony.

*See* Utah Code Ann. § 31A-22-305(6).

## DISCUSSION

The Utah Supreme Court, in *Jones v. Farmers Insurance Exchange*, 286 P.3d 301 (Utah 2012), explained that the teachings found in *Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985) provide the starting point for analyzing any fairly debatable defense:

> As we explained in *Beck v. Farmers Insurance Exchange*, an insurer's implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." But

> "when an insured's claim is fairly debatable, the insurer is entitled
> to debate it and cannot be held to have breached the implied
> covenant [of good faith] if it chooses to do so." This is because the
> duties imposed by the implied covenant of good faith "plainly
> indicate that the overriding requirement imposed . . . is that
> insurers act reasonably, as an objective matter, in dealing with their
> insureds." Therefore, an insurer cannot be held to have breached
> the covenant of good faith "on the ground that it wrongfully denied
> coverage of the insured's claim, although later found to be proper,
> was fairly debatable at the time it was denied."

*Jones,* 286 P.3d at 304 (quoting *Beck ,* 701 P.2d at 798). Stated another way, the denial of an

insurance claim is reasonable, as a matter of law, if the insured's claim is "fairly debatable." *See*

*Saleh v. Farmers Ins. Exch*., 133 P.3d 428 (Utah 2006); *Prince v. Bear River Mut. Ins. Co., 56*

P.3d 524, 533-34 (Utah 2002); *Callioux v. Progressive Ins. Co*., 745 P.2d 838, 842 (Utah Ct.

App. 1987). A claim is "fairly debatable" where there is evidence presented that creates a

factual issue as to the claim's validity. *See Prince*, 56 P.3d at 535. Utah courts have held that an

expert's report generally provides a good faith basis for an insurer's defense of a bad faith claim.

*See Prince*, 56 P.3d at 535;[7] *Callioux*, 745 P.2d at 842.

Ms. Eldredge argues that blind reliance on an expert opinion should not create a safe

harbor from a bad faith claim, especially when, in her view, the expert report does not directly

---

[7] In *Prince*, the court stated that

Denying benefits under an insurance policy in reliance on an expert's report, such as a
doctor's report, even if the expert's opinion is provided in exchange for remuneration, is
not a bad faith denial because the expert's report creates a legitimate factual question
regarding the validity of an insured's claim for benefits, making the insured's claim at
least fairly debatable.

56 P.3d at 535. In *Callioux*, the court explained that "[a]n expert's report generally
provides a good faith basis for an insurer's defense of a bad faith claim." 745 P.2d at 842.

refute contrary expert opinion. According to Ms. Eldredge, an insurer cannot recklessly disregard the facts. She also claims that failure to make any settlement offer is evidence of bad faith. Ms. Eldredge, however, has cited no Utah law for such propositions, and the court disagrees with her characterization that State Farm blindly relied on the expert report or that it recklessly disregarded the facts in this case. Instead, the court finds that State Farm satisfied its obligation to its insured under Utah law.

Under Utah law, Ms. Eldredge's UM claim was fairly debatable when State Farm denied it, and no reasonable jury could find otherwise. The fact that Ms. Eldredge's expert disagreed with the conclusions reached by State Farm's expert (and the conclusions of the Honolulu Police Department and the Honolulu law firm hired by the Eldredges) does not breathe life into a bad faith cause of action. The question before the court is not whether a second vehicle was in fact involved in the accident, but whether the claim was fairly debatable when State Farm denied it – and it was. Moreover, Ms. Eldredge's policy required her to show the existence of another motor vehicle *by clear and convincing evidence*, and given the various conclusions reached by different individuals in this case, under no circumstance could Ms. Eldredge's evidence be characterized as "clear and convincing."

While Ms. Eldredge undeniably suffered a tragic accident in which she was severely injured, she cannot prevail on her claim that State Farm breached the covenant of good faith and fair dealing, and consequently, that claim must be dismissed.[8]   Additionally, because the court

---

[8]  The court also finds that there are no genuine issues of material fact as to whether State Farm diligently investigated the claim, whether it fairly evaluated the claim, or whether it promptly and reasonably denied the claim.

has found that State Farm's denial of Ms. Eldredge's UM claim was fairly debatable, she cannot prevail on her claim for intentional infliction of emotional distress." *See Saleh*, 133 P.3d at 435; *Prince*, 56 P.3d at 524 (Utah 2002).

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that State Farm's Motion for Partial Summary Judgment [Docket No. 10] is GRANTED, and Ms. Eldredge's causes of action for breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress are DISMISSED with prejudice.

DATED this 9th day of May, 2014.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge